ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (SBN 213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
shawnw@rgrdlaw.com

HERMAN JONES LLP
JOHN C. HERMAN (*pro hac vice* forthcoming)
3424 Peachtree Road, NE, Suite 1650
Atlanta, GA  30326
Telephone:  404/504-6500
jherman@hermanjones.com

Attorneys for Plaintiff and the Class

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MATTHEW MAZZA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ROBINHOOD MARKETS, INC. and ROBINHOOD DERIVATIVES, LLC, <br><br> Defendants. | Case No. _____ <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF: <br> (1) Civil Remedy Statutes for Recovery of Gambling Losses; <br> (2) O.C.G.A. § 13-8-3; <br> (3) Georgia Fair Business Practices Act, O.C.G.A. § 10-1-399, *et seq.*; <br> (4) California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; and <br> (5) Unjust Enrichment <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Matthew Mazza ("Plaintiff"), by and through his undersigned attorneys, brings this action individually and on behalf of all others similarly situated, against Defendants Robinhood Markets, Inc. and Robinhood Derivatives, LLC (collectively "Defendants" or "Robinhood") to recover billions of dollars in wagers from Robinhood's unlawful operation of an unlicensed sports gambling platform and related deceptive and misleading business practices. Plaintiff makes his allegations upon personal knowledge as to his own acts, and upon information and belief as to all other matters, as well as based upon the ongoing investigation of his counsel.

**INTRODUCTION**

1.     Defendants facilitate the sale of illegal and unregulated sports event contracts to its customers through its mobile application ("app") and website.[1]  Robinhood attempts to skirt around sports betting restrictions – which fall under state control since a 2018 Supreme Court decision in *Murphy v. NCAA*, 584 U.S. 453 (2018) – by selling bets that it characterizes as financial contracts tied to the outcome of events, known as "event contracts," and arguing that these so-called "prediction markets" are akin to commodity markets, regulated not by state sports betting laws, but the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and the Commodity Futures Trading Commission ("CFTC").

2.     Robinhood facilitates the sale of the event contracts to its customers through a partnership with non-party prediction market platform on its designated contract market. Robinhood's customers are led to believe that sports event contracts are a modern, sophisticated form of investing on a federally regulated commodities exchange that can be accessed on a phone.

3.     In reality, the sports event contracts Robinhood sells are ordinary, old-fashioned bets or wagers on the outcomes of sporting events (*i.e.*, gaming).  By operating an unlicensed sports gambling operation, Robinhood has violated state gambling laws and regulations, engaged in deceptive conduct, and unjustly enriched itself at the expense of millions of consumers.

---

[1]    *See, e.g.*, *Prediction markets*, Robinhood, https://robinhood.com/us/en/prediction-markets/ (last visited June 9, 2026).

CLASS ACTION COMPLAINT – NO.                                                                                    - 1 -

4.      Robinhood began selling event contracts on October 28, 2024, to anyone purportedly over the age of 18 in all U.S. states, including in states where gambling in casinos and making bets through sportsbooks is illegal, restricted to individuals who are 21 or older, like Georgia or New Jersey, or limited to Native American reservations, like Arizona, Connecticut, Florida, Washington, Wisconsin, and New Mexico.  Robinhood aggressively markets prediction markets – through push notifications from its app, television commercials, and advertisements on the internet – to potential users and accepts payments through financial systems widely accessible to consumers.

5.      According to Robinhood, "[a]n event contract is a type of financial derivative that allows traders to speculate on a specific event. These contracts are generally structured around 'Yes' or 'No' positions and fluctuate in price based on the projected occurrence of the event. Event contracts then pay out if the position held matches the correct occurrence of the event; otherwise, they expire with no value."[2]  Event contracts are priced between one cent and 99 cents with each cent representing a 1% probability of the event occurring.  As described by Robinhood, "if a contract is priced at 53 cents, this can be interpreted as a 53% probability that it will occur according to that market."[3]

6.      Robinhood's first event contracts allowed users to trade on the outcome of the 2024 presidential election by offering a contract for Kamala Harris and a contract for Donald Trump. On March 17, 2025, Robinhood expanded its prediction market gaming offerings to illegal sports betting through its partnership with Kalshi Inc. ("Kalshi"), while continuing to maintain the fiction that users were trading event contracts on its "Prediction Markets Hub."[4]  This form of betting

---

[2]    Robinhood Markets, LLC, Annual Report (Amended) (Form 10-K/A) at 13 (Feb. 20, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001783879/000178387926000029/hood-20251231.htm.

[3]    *Event Contracts Overview*, Robinhood, https://robinhood.com/us/en/support/articles/robinhood-event-contracts/ (last visited June 9, 2026).

[4]    Robinhood Markets, LLC, Annual Report (Amended) (Form 10-K/A) at 13 (Feb. 20, 2026) (Robinhood's SEC Form 10-K/A states, "[o]ur customers can trade event contracts on a regulated exchange using our Prediction Markets Hub, for which we charge a commission for each contract traded"),

CLASS ACTION COMPLAINT – NO.                                                                              - 2 -

through Robinhood is available in all 50 states, including states that have outright bans on gambling, as well as states like Georgia that allow some gambling but ban sports betting.

7. In offering sports gambling to consumers, Robinhood creates a misleading impression, either actively or by omission, that these prediction markets have the approval of state gambling control authorities and are legal when, in fact, they do not and are illegal under state law. In fact, the State of Georgia does not even currently have an official state gaming commission for casino or sports betting, as these activities are illegal throughout the state.

8. People who are prone to gambling compulsions and avoid gambling websites, but maintain brokerage accounts (collectively "brokerage accounts") with Robinhood, are exposed to gambling-related communications and at times succumb to the abuses of compulsive gambling.[5]

9. Unlike traditional gambling sites that require cash deposits for gambling, Robinhood enables brokerage clients to gamble against margin on security positions, exposing customers to substantial losses on their portfolios. Robinhood further entices its customers to gamble by strongly encouraging them to keep their assets with Robinhood rather than removing them from the platform.

10. The Georgia State Constitution makes sports gambling and wagering illegal. As a result, Georgia is one of the few states that has no specific gaming or gambling commission beyond the Georgia Lottery Corporation.

11. While the State of Georgia has not issued cease-and-desist mandates, attorneys in multiple states have been investigating Robinhood's non-compliance with anti-gambling statutes. Further, regulators throughout the country, including in Arizona, Connecticut, Illinois, Maryland,

---

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001783879/000178387926000029/hood-20251231.htm.

[5] A review of sports wagering and gambling addiction studies conducted by the National Council on Problem Gambling shows that "[t]he rate of gambling problems among sports bettors is at least twice as high as among gamblers in general. . . . [and] the rate of problems is even higher" when sports wagering takes place online, "with one study of online sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems." *A Review of Sports Wagering & Gambling Addiction Studies Executive Summary*, Nat'l Council on Problem Gambling, https://www.ncpgambling.org/wp-content/uploads/2023/09/Sports-gambling_NCPGLitRvwExecSummary.pdf (last visited June 9, 2026).

CLASS ACTION COMPLAINT – NO.                                                                    - 3 -

Michigan, Montana, Nevada, New York, New Jersey, Ohio, and Tennessee, among others, have sent cease-and-desist letters to operators of online prediction markets, like Robinhood. Indeed, New York State Attorney General Letitia James issued a Consumer Alert on February 2, 2026, ahead of the 2026 Super Bowl, in which she noted, "[p]rediction markets may appear as modern, high-tech platforms for speculation or 'forecasting,' but in practice, many operate as unregulated gambling without the basic protections . . . consumers both deserve and expect from properly licensed operators."[6]

12.    Plaintiff brings this class action on behalf of himself and the classes of all others similarly situated persons (defined below) to seek relief from Robinhood's unlawful sports gambling operations.

**THE PARTIES**

13.    Plaintiff Matthew Mazza is a resident and citizen of the State of Georgia. At relevant times hereto, Plaintiff wagered and lost money trading sports event contracts through Robinhood's Prediction Markets Hub.

14.    Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business located at 85 Willow Road in Menlo Park, California. Defendant Robinhood Markets, Inc. conducts business in California and throughout the United States. Robinhood Markets, Inc. is the parent company of Robinhood Derivatives, LLC. On information and belief, Robinhood Markets, Inc. is the parent company of all Robinhood entities, including Defendant Robinhood Derivatives, LLC. Robinhood is an investment platform that permits trading on stocks, exchange-traded funds (ETFs), other commodities, and cryptocurrency. On its investment platform, Robinhood has opened a prediction market hub, allowing Georgia and other states' residents to place illegal, unregulated wagers in the form of event contracts. In concert with Kalshi,

---

[6]   Press Release, *Consumer Alert and Industry Alert: Attorney General James Warns New Yorkers of Potential Harms of Sports Betting and Prediction Markets*, N.Y. Atty. Gen. (Feb. 2, 2026), https://ag.ny.gov/press-release/2026/consumer-alert-and-industry-alert-attorney-general-james-warns-new-yorkers.

CLASS ACTION COMPLAINT – NO.                                                                 - 4 -

it operates a prediction market, allowing its customers to place illegal, unregulated wagers in the form of event contracts, including through use of their Robinhood brokerage accounts.

15.     Defendant Robinhood Derivatives, LLC is a Delaware limited liability company with its principal place of business at 85 Willow Road in Menlo Park, California.  Robinhood Derivatives, LLC is a wholly owned subsidiary of Defendant Robinhood Markets, Inc. and conducts business in California and throughout the United States.  According to Robinhood Markets, Inc.'s U.S. Securities and Exchange Commission ("SEC") Form 10-K/A, Robinhood Derivatives "facilitate[s] trading of futures contracts, event contracts, and options on futures contracts for our customers."[7]  In its SEC Form 10-K/A, Robinhood Markets, Inc. refers to itself and its subsidiaries, including Robinhood Derivatives, LLC as "we," "us," "Robinhood," or the "Company," and states that "[o]ur corporate headquarters are located in Menlo Park, California."[8] Each of Robinhood Derivatives, LLC's Head of Engineering, Assistant General Counsel (Regulatory), and Deputy General Counsel conducts business within this District.  Robinhood Derivatives, LLC claims to be a futures commission merchant that provides options on futures trading.  In reality, Robinhood Derivatives, LLC, uses its Prediction Market Hub to allow Georgia residents and customers throughout the United States to place illegal, unregulated wagers on sports games.

16.     Robinhood Markets, Inc. is generally responsible for all of Robinhood's operations, including prediction markets, whereas Robinhood Derivatives, LLC is specifically responsible for facilitating the sale of gaming event contracts.

**JURISDICTION AND VENUE**

17.     This Court has subject matter jurisdiction over this action under 28 U.S.C § 1332, because the proposed class consists of 100 or more potential class members; the amount in

---

[7]   Robinhood Markets, LLC, Annual Report (Amended) (Form 10-K/A), at 30 (Feb. 20, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001783879/000178387926000029/hood-20251231.htm.

[8]   *Id*. at 4, 99.

controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and minimal diversity exists.

18.    This Court has personal jurisdiction over Defendants because Robinhood's principal place of business is within this District and Robinhood conducts substantial business in this District.

19.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because Defendants reside within this District within the meaning of 28 U.S.C. § 1391 and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

**DIVISIONAL ASSIGNMENT**

20.    Pursuant to Northern District of California Civil Local Rules 3-2(c), 3-2(d), and 3-5(b), assignment to the San Francisco or San Jose Division of this District is proper because Robinhood's principal office is located in San Mateo County, California, and a substantial part of the events giving rise to the claim occurred in San Mateo County.

**FACTUAL BACKGROUND/FACTUAL ALLEGATIONS**

21.    This litigation centers on "prediction markets," which allow for the purchase and sale of "event contracts." Event contracts are defined by federal statute as "agreements, contracts, transactions, or swaps in excluded commodities," *i.e.*, in commodities that do not have intrinsic cash value and that are not traded on a stock market, "that are based upon the occurrence, extent of an occurrence, or contingency," "other than a change in the price, rate, value, or levels of a commodity." 7 U.S.C. § 7a-2(c)(5)(C)(i). Put more simply, event contracts are futures contracts that pay out if some non-commodity-related future event does (or does not) occur.

CLASS ACTION COMPLAINT – NO.                                                                              - 6 -

## ROBINHOOD OFFERS SPORTS BETTING, EUPHEMISTICALLY REFERRED TO AS "SPORTS EVENT CONTRACTS"

**Background on Robinhood**

23. Robinhood was founded in 2013 with the mission to quote "democratize finance for all." Robinhood was the first U.S. retail broker to offer commission–free stock trading with no account minimum, which was subsequently adopted by the industry.

24. On October 28, 2024, Robinhood introduced its first prediction market, the "Presidential Election Market."[9] Robinhood stated, "customers will be able to trade based on their prediction for 'who will win the 2024 presidential election.' There will be two contracts to choose from – one for Kamala Harris, and one for Donald Trump."

25. Robinhood describes event contracts as "allow[ing] customers to trade on the outcome of specific events," and further stated, "[w]e believe event contracts, give people a tool to engage in real-time decision-making, unlocking a new asset class that democratizes access to events as they unfold."[10]

**Background on Prediction Markets and Event Contracts**

26. In the United States, prediction markets have been around since 1988 when the Iowa Presidential Stock Market (now Iowa Electronic Market ("IEM")) was created as an "experimental and academic program" at the University of Iowa. The IEM was designed as an academic and educational experiment, it allowed real-money trading on political elections to see if markets could outperform traditional polling.

27. In the early 2000s, interest in prediction markets expanded with projects like: Hollywood Stock Exchange (a play-money market for predicting box office returns and award outcomes); Intrade.com and Tradesports.com (real-money markets covering politics, current events, and other outcomes); and Defense Advanced Research Projects Agency's (DARPA) Policy

---

[9] *Introducing the Presidential Election Market*, Robinhood News (Oct. 28, 2024), https://robinhood.com/us/en/newsroom/introducing-the-presidential-election-market/.

[10] *Id*.

Analysis Market: A controversial (and ultimately cancelled) proposal for a market in geopolitical events.[11]

28.    Since as early as July 2021, prediction markets in the United States have enabled individuals in all 50 States (including Georgia) to gamble on a wide range of future events spanning a wide range of subject matters.  For instance, prediction markets such as Kalshi, Polymarket US, and ForecastEx, LLC offer wagers on each of:

- ▪ "Will President Trump be impeached during his term?"

- ▪ "Will members of Congress be banned from trading stocks?"

- ▪ "Which party will win the U.S. House?"

- ▪ "When will bitcoin cross $100k again?"

- ▪ "Who will win an ATP Grand Slam this year?"

- ▪ "[Who will be the] Monaco Grand Prix Main Race Winner?"

- ▪ "Marlins vs Mets: First Inning Run?"

- ▪ "[Who will be] Kansas Basketball - Next Head Coach?"

- ▪ "[What will be the point spread in] MTL Canadiens vs CAR Hurricanes?"

29.    Event contracts share a common form.  For each, the prediction market poses a question about some definite future event.  For example, "Will the Vegas Golden Knights win the 2026 Stanley Cup?"  The user is then presented with two options: "Yes" or "No."  Users can make a wager on either answer at some variable price (purportedly set by market forces), ranging from $0.01 to $0.99.  When the "Yes" and "No" options combined add up to exactly $1, an "event contract" is formed.  Then, the parties wait for the event to occur that provides an answer to the question (in the example above, whether the Vegas Golden Knights win the 2026 Stanley Cup). If the Golden Knights win, the prediction market will pay the bettors who placed money on the answer "Yes" the value of the $1 contract, while the bettors who bet "No" will lose all of the money that they wagered.  A bettor can make multiple bets on this same event.  Thus, while the

---

[11]  Jason Collins, *Course notes on behavioural economics and corporate decision making*, (Apr. 8, 2025), https://corporate.jasoncollins.blog/.

individual bets may be small, the collective amount an individual can lose on a single event can be significant.

30.    Often the prediction market permits "trading" (before a contract is finalized) of both "Yes" and "No" options.  For example, if a user believes that the market is undervaluing the Golden Knights' chances of winning the Stanley Cup, that party is incentivized to purchase "Yes" contracts, driving the "Yes" price up and the "No" price down.  Similarly, if a party believes that the market is undervaluing the Golden Knights chances of losing the Stanley Cup, that party is incentivized to buy "No" contracts, driving the "No" price up and the "Yes" price down.  In that way, the final prices of both the "Yes" and "No" options should theoretically correspond to the percentage chance the market gives of each outcome occurring.  So if, for example, "Yes" votes on the Golden Knights were valued at $0.44 and "No" votes were valued at $0.56 (adding up to exactly $1), the predictions market would give the Golden Knights a 44% chance of winning and other teams a 56% chance of winning.

31.    Prediction markets business model closely resembles that of a traditional bookmaker.  Ordinarily, bookmakers try to minimize risk by adjusting their betting lines to incentivize roughly equal investment on both sides of a wager.  For example, if gamblers overwhelmingly bet in favor of the Vegas Golden Knights as a -400 favorite, sports books could move the betting line on the Golden Knights to make them a -450 or -500 favorite instead.  This would reduce the profitability of betting on the Golden Knights, incentivizing more gamblers to come in on the other side of the ledger.  By adjusting betting lines in this way, bookmakers can "balance their books."  This ensures that they minimize losses, no matter who wins on the football field.  And over time, it ensures they turn a profit.  That is because the betting lines they offer for and against a team or player always preserve an edge for the house.  Put differently, a gambler betting an equal amount of money for and against the same bet at a sportsbook will always lose expected value.  Modern prediction markets merely takes this business model and takes it one step further.  Rather than derisking operations by roughly balancing the money on both sides of the ledger, they derisk operations by algorithmically equalizing them in its clearinghouse.

32. Just like a traditional sportsbooks, prediction markets make a profit by building into its calculus a small, statistical edge for itself. As the Maryland Lottery and Gaming Control Commission observed in a recent cease-and-desist letter to one such prediction market: "The purchase of the [event] contract is indistinguishable from the act of placing a sports wager."

**Robinhood Launches a Prediction Markets Hub**

33. In 2024, Robinhood experimented with offering its own event contracts, allowing users nationwide (including, on information and belief, the State of Georgia) to gamble on the result of the then-upcoming presidential election as set forth above.

34. In May 2025, Robinhood launched what it dubbed a "Prediction Markets Hub" within its mobile app. Through the Prediction Markets Hub, Defendants enabled Robinhood users to buy and sell Kalshi event contracts without ever having to leave the Robinhood platform. Because Robinhood's event contracts are sourced by Kalshi, its Prediction Markets Hub is substantially identical to the prediction platform Kalshi offers on its own website. The Robinhood platform, which also includes a dedicated website, is available to individuals in all 50 States, including in Georgia. Robinhood receives a "transaction fee" each time an event contract is purchased on its platform. It is, therefore, a "winner" for all the same reasons and in all the same ways that Kalshi or a bookie is a "winner." Robinhood secures winnings at the expense of individual gamblers.

35. On February 3, 2025, Robinhood announced the launch of event contracts for Super Bowl LIX, which was Robinhood's first attempt to offer sports-related event contracts. The event contracts were made available "in all 50 states . . . and allowed eligible customers to place trades on the outcome of the showdown between Kansas City and Philadelphia." Robinhood's announcement stated that "event contracts for the pro football championship, leverage *the power and rigor of financial market structure* to facilitate greater liquidity, transparency, and price discovery." The announcement further stated Robinhood's mission is to democratize finance for all. "With an emerging asset class like event contracts, we recognize an opportunity to better serve our customers as their interests converge across markets, news, sports and entertainment."

CLASS ACTION COMPLAINT – NO.                                                    - 10 -

36.    The next day, on February 4, 2025, Robinhood announced that it had suspended the event contracts for Super Bowl LIX, cancelling the event following the CFTC's demand that Robinhood "not permit customers to access sports event contracts."   In response, Robinhood posted on X: "[w]e are disappointed by this outcome, especially given that we had been in regular communication with the CFTC about our intent and plans to offer this product.  We will continue to collaborate with the CFTC as we work to roll out a more comprehensive event contracts platform later this year."[12]

37.    On March 17, 2025, Robinhood launched its Prediction Market Hub and began offering sports event contracts, which it made available across the United States.  Robinhood stated that "the hub will allow customers to trade contracts for what the upper bound of the target [F]ed funds rate will be in May, as well as the upcoming men's and women's college basketball tournaments."  In connection with this launch, the Vice President and General Manager of Futures and International at Robinhood Markets, Inc., JB Mackenzie ("Mackenzie"), stated:

> "We believe in the power of prediction markets, and think they play an important role in the intersection of news, economics, politics, sports and culture . . . . We're excited to offer our customers a new way to participate in prediction markets, and look forward to doing so in compliance with existing regulations."[13]

38.    That same day, sports betting event contracts related to the National Collegiate Athletic Association college basketball tournaments became available.

39.    On August 19, 2025, Robinhood expanded its sports gambling options, adding professional and college football event contracts to its Prediction Markets Hub.[14]  Mackenzie stated, "adding pro and college football to our prediction markets hub is a no-brainer for us as we aim to make Robinhood a one-stop shop for all your investing and trading needs."  Robinhood claimed its event prediction markets were more sound than traditional gambling alternatives,

---

[12]   Robinhood Comms (@RobinhoodComms), X (Feb. 4, 2025), https://x.com/RobinhoodComms/status/1886830533415502082.

[13]   *Robinhood Launches Prediction Markets Hub*, Robinhood News (Mar. 17, 2026), https://robinhood.com/us/en/newsroom/robinhood-prediction-markets-hub/.

[14]   *Robinhood Launches Pro and College Football Prediction Markets*, Robinhood News (Aug. 19, 2025), https://robinhood.com/us/en/newsroom/pro-and-college-football-prediction-markets/.

stating, "unlike sports betting, where the firm sets a line, event contracts leverage the power and rigor of financial market structure and are offered in a marketplace where buyers and sellers interact to set the price."[15]

40.    On December 16, 2025, Robinhood announced the launch of new types of sports event contracts, including preset combos, custom combos, and player contracts which mirror traditional forms of sports wagering, such as point spreads, totals, player props, and parlays:

**Preset Combos**: Customers will be able to trade preset combos for individual Pro Football games, giving them another way to turn their nuanced sports knowledge into an investing opportunity. These will be a combination of the outcomes, totals, and spreads within a single game. Like any event contract, these combos will pay $1 dollar, but only if each of the outcomes in the contract resolves correctly.

**Custom Combos**: Early next year, we'll add support for custom combos, which will allow customers to combine up to ten outcomes into one new contract across Pro Football games.

**Player Contracts**: Starting today, customers can track and trade individual Pro Football player performances like Anytime TD, Passing Yards, Receiving Yards, Rushing Yards, and more in real time, all in one place. Player contracts for more sports will be rolling out soon as well.[16]

41.    The December 16, 2025 announcement stated:

"These tools give traders greater precision, control, and access to the events they care about most.  Expanding our prediction markets is an important step forward in our goal to enable anyone to trade, invest or hold any financial asset and conduct any financial transaction through Robinhood."[17]

42.    The announcement also reported that Robinhood's Prediction Markets Hub was "Robinhood's fastest-growing product line by revenue ever, with 11 billion contracts traded by more than 1 million customers" since its launch.[18]

43.    On November 19, 2025, Robinhood invested in Rothera, a joint venture with Susquehanna International Group, a privately-held trading and technology firm, to advance the

---

[15]    *Id.*

[16]    *Robinhood unveils latest AI innovations and prediction markets features at Robinhood Presents: YES/NO*, Robinhood News (Dec. 16, 2025), https://robinhood.com/us/en/newsroom/robinhood-presents-yes-no-event/.

[17]    *Id.*

[18]    *Id.*

development of an exchange and clearinghouse for its prediction markets.  On January 20, 2026, Rothera acquired a 90% majority stake in MIAXdx, renamed Rothera E&C, a designated contract market, derivatives clearing organization, and swap execution facility.  Robinhood Markets, Inc.'s investments in Rothera and MIAXdx were intended to allow Robinhood  to operate its prediction markets independently of Kalshi.

44.    Currently, Robinhood's Prediction Markets Hub offers event contracts across 15 different sports, including in racing, eSports, and cricket.[19]  On February 8, 2026, an estimated $285 million was traded on Robinhood's platform on the winning team of Super Bowl LX alone.[20]

45.    Robinhood describes this expanded offering of event contracts as "unlocking a new asset class."[21]  However, unlike with its other offerings, Robinhood charges a commission of $0.01 for each event contract bought or sold on its Prediction Markets Hub.  Robinhood may also charge an exchange fee depending on the exchange the contract is traded on, which is typically $0.01 per contract.  Because Robinhood's contracts are historically sourced from Kalshi, its Prediction Markets Hub is substantially identical to the prediction market platform Kalshi offers on its own website.

46.    Under the terms of its agreement with Kalshi, Robinhood shares in Kalshi's "transaction fee" and earns interest on consumer funds each time an event contract is purchased on its platform.  It is, therefore, a "winner" for all the same reasons and in the same way that Kalshi is a "winner."

---

[19]    *Prediction markets*, Robinhood, https://robinhood.com/us/en/prediction-markets/ (last visited June 9, 2026).

[20]    Weston Blasi, *In a coming-out party for prediction markets and sports, people just traded nearly $1.5 billion on the Super Bowl winner*, MarketWatch (Feb. 9, 2026), https://www.marketwatch.com/story/in-a-coming-out-party-for-prediction-markets-and-sports-people-just-traded-nearly-1-5-billion-on-the-super-bowl-winner-86613100.

[21]    *Introducing the Presidential Election Market*, Robinhood News (Oct. 28, 2024), https://robinhood.com/us/en/newsroom/introducing-the-presidential-election-market/.

CLASS ACTION COMPLAINT – NO.                                                                                    - 13 -

47.    According to Robinhood, more than 12 billion event contracts were traded on Robinhood in 2025, including a record 8.5 billion traded in the fourth quarter alone.[22]

48.    Customers who maintain Robinhood brokerage accounts and who recognize their own susceptibility to compulsive gambling and, thus, avoid gambling platforms were exposed to Robinhood's ubiquitous promotional material concerning prediction markets (*i.e.*, gambling).

49.    Robinhood enables customers to place gaming wagers against margin on their securities portfolios, exposing customers to the loss of their securities portfolios through unregulated and potentially compulsive gaming activities.

50.    However, Defendants' marketing and user-interface design do not adequately communicate the practical reality that customers, including Plaintiff and the Class, may be using their Robinhood securities portfolios as collateral to engage in highly speculative event-contract trading for which there is no corollary underlying collateral (like an investment in gold) or ownership interest (like stock in a company) and that can rapidly erode equity in the user's financial securities account.  Robinhood's educational materials do a poor job, if any, describing risks such as margin calls, forced liquidation, and losses exceeding deposits, and those disclosures (if any) are often embedded within lengthy legal agreements, help-center articles, or generalized risk statements rather than presented in a prominent, transaction-specific manner at the point of trade execution.  Thus, Robinhood insufficiently warns consumers that speculative trading against margin may expose core investment holdings and long-term stock portfolios to substantial and accelerated losses and even significant debt.

51.    In its fiscal year ending December 31, 2025, Robinhood collected $302 million in "other transaction-based revenue," a 260% increase from the previous year, which was "primarily driven by increased user activities in Prediction Markets and instant withdrawals."[23]

---

[22]  Hannah Erin Lang, *Robinhood Gets a Prediction-Market Lift, Despite Cooling Crypto Business*, Wall St. J. (Feb. 10, 2026), https://www.wsj.com/finance/stocks/robinhood-earnings-q4-2025-hood-stock-fd4f6c37.

[23]  Robinhood Markets, Inc. Annual Report (Amended) (Form 10-K/A) at 110 (Feb. 20, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001783879/000178387926000029/hood-20251231.htm.

## PLAINTIFF LOST HIS LIFE SAVINGS ON
## ROBINHOOD'S SPORTS EVENT CONTRACTS

52.     Plaintiff had a brokerage account with Robinhood Derivatives, LLC and lost approximately $400,000, including fees and commissions, wagering on Robinhood's Prediction Markets Hub in 2025 and 2026 (including on sports event contracts).

## ROBINHOOD'S PREDICTION MARKETS HUB IS
## AN ILLEGAL GAMBLING OPERATION

53.     In 1992, the federal government passed the Professional and Amateur Sports Protection Act ("PASPA"), which effectively outlawed sports betting nationwide, with the exception of a few states.

54.     In 2018, the Supreme Court struck down PASPA in *Murphy v. NCAA*, 584 U.S. 453 (2018), holding that it violates the Constitution's "anticommandeering" principle by preventing the states from modifying or repealing their laws prohibiting sports gambling.  In *Murphy*, the Supreme Court made clear that states, not the federal government, have the right to regulate sports betting. *Id.* at 474.

55.     Since *Murphy* was decided, 39 states and Washington D.C. have legalized some form of sports betting as of April 6, 2026.  Thirty of those states have legalized online sports betting through smartphone apps or websites.[24]  The State of Georgia is not one of them.

56.     Notwithstanding Robinhood's attempt to repackage sports wagers as "event contracts," Robinhood's offerings are nothing more than unlawful online sports bets.  Robinhood's users place bets on the outcome of events they do not control and have no relationship to economic markets or events.  A prediction market that offers sports event contracts is no different than a sports gambling book that lacks a license from any state gambling authority.

---

[24]   Brandt Sutton & Chelena Goldman, *U.S. sports betting: Where all 50 states stand on online sports betting sites*, CBS Sports, https://www.cbssports.com/betting/news/u-s-sports-betting-where-all-50-states-stand-on-legalizing-online-sports-betting-sites-proposed-legislation/     (last visited June 9, 2026).

CLASS ACTION COMPLAINT – NO.                                                          - 15 -

57.     Indeed, Robinhood offers sports event contracts that are functionally identical to sports bets found in traditional sportsbooks like DraftKings and FanDuel.[25] As stated above, Robinhood offers sports event contracts that mirror Moneyline bets, point spreads, totals, player props, and parlays.  Moreover, Robinhood offers odds and payouts that are nearly identical to the odds and payouts offered by traditional sportsbooks.

58.     Prediction markets are and have been referred to as gambling enterprises, advertising to consumers that they can make a "bet" on sporting events:[26]

---

[25]     *See* Press Release, *AG Campbell Secures Court Order That Will Block Kalshi from Offering Unlawful Sports Wagers in Massachusetts*, Mass. Ofc. of Atty. Gen. (Jan. 20, 2026), https://www.mass.gov/news/ag-campbell-secures-court-order-that-will-block-kalshi-from-offering-unlawful-sports-wagers-in-massachusetts (discussing court granting "preliminary injunction . . . prohibiting Kalshi from accepting online sports wagers and related events contracts from Massachusetts customers until the company follows the state laws that govern sports gaming"); *KalshiEX, LLC v. Flaherty*, 2026 U.S. App. LEXIS 9948, at *20 (3d Cir. Apr. 6, 2026) (Roth, J., dissenting) (Kalshi's offerings "are virtually indistinguishable from the betting products available on online sportsbooks, such as DraftKings and FanDuel.").

[26]     Dustin Gouker, LinkedIn, https://www.linkedin.com/posts/dustin-gouker-876857b5_on-the-morning-of-the-super-bowl-kalshi-activity-7294395418157752320-eAPA; Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself As A Betting Platform,* Event Horizon (Aug. 27, 2025), https://nexteventhorizon.substack.com/p/yes-kalshi-is-still-marketing-itself-as-betting.







60.    Robinhood's Prediction Market Hub is, likewise, an illegal gambling operation.

**THE STATE OF PLAY IN GEORGIA**

61.    The State of Georgia comprehensively regulates gambling-related activities within Georgia.  To protect its residents from predatory and financially destructive gambling enterprises, it has prescribed exacting civil and criminal penalties on all those who would seek to sidestep that regulatory regime.  *See* O.C.G.A. § 16-12-20, *et seq.*

62.    In the State of Georgia, gambling is broadly prohibited.  Georgia makes it a felony to engage in "commercial gambling," which includes "[r]eceiv[ing], record[ing], or forward[ing] a bet or offer to bet." O.C.G.A. § 16-12-22(a)(2).  That prohibition exempts only a small number of legal gambling activities such as the Georgia State lottery (operated by the Georgia Lottery Corporation), bingo, and certain charitable raffles.  *See* O.C.G.A. § 16-12-20(4). Georgia allows no casinos in the state and does not purport to permit sports gambling or any other sort of legalized betting.

63.    The only forms of legal gambling allowed in the State of Georgia are the official Georgia State Lottery, charitable raffles, and bingo games.

64.    Illegal gambling in the State of Georgia is punishable as a crime.  Under O.C.G.A. § 16-12-21 "gambling" is defined as:

> Mak[ing] a bet upon the partial or final result of any game or contest or upon the performance of any participant in such game or contest;
>
> Mak[ing] a bet upon the result of any political nomination, appointment, or election or upon the degree of success of any nominee, appointee, or candidate; or
>
> Play[ing] and bet[ting] for money or other thing of value at any game played with cards, dice, or balls.

65.    Robinhood is not licensed to operate in the State of Georgia as sports wagering is barred by Georgia law.  *See* O.C.G.A. § 16-12-21.

66.    In California, gambling activities and establishments are regulated by the California Gambling Control Act, Cal. Bus. & Prof. Code § 19800 *et seq.*, which prohibits unregulated commercial gambling operations, except where expressly permitted by California law.  See Cal. Bus. & Prof. Code § 19801(d). The California Gambling Control Commission ("C.A.

Commission") is the official regulatory body over the operation of gambling establishments in California. However, Robinhood is likewise not licensed to conduct sports betting in California.

67. Despite offering sports betting in various states, Robinhood has not registered for or obtained a license with any state gaming commission. In doing so, Robinhood makes unlawful sports gambling widely available through its platform, without any safeguards mandated for licensed sports wagering operations and without oversight by any state gaming commission, exposing users to the harms of unregulated gambling.

**RECOVERING ILLEGAL GAMBLING LOSSES AND
GEORGIA'S STATUTE OF ANNE**

68. Like many states, the State of Georgia offers an additional safeguard against illegal, unregulated gambling: O.C.G.A. § 13-8-3. Based on a portion of the 1710 British law passed during the reign of Queen Anne (the "Statute of Anne"), that law makes certain gambling debts unenforceable. It allows a losing party to sue the winning party for the value of losses. And, should the losing party fail to sue within six months, it authorizes anyone to bring a claim to recover the losing party's gambling losses. O.C.G.A. § 13-8-3.

69. Thus, several states, including Georgia, allow individuals to recover funds lost in connection with an illegal gambling operation from any "winner," "stakeholder," or "person" who received their wagers under state laws modeled after the Statute of Anne, which made certain gambling debts unenforceable.

70. For years, Defendants have operated a gambling operation in Georgia without regard to the State's legal limits. Each year, they take tens of millions of dollars from Georgia gamblers. But under O.C.G.A. § 13-8-3, each time Defendants caused a gambler in Georgia to suffer gambling losses, that person had the right to sue under O.C.G.A. § 13-8-3 within six months. And after six months, any person may sue for each gambler's unrecovered losses, receiving half as a relator's fee, and sharing the other half with the education fund of the County in which the gambling injury occurred. In filing this action, Plaintiff takes just that step for his own losses, as a relator for losses beyond six months old and going forward on behalf of Class members as described below.

CLASS ACTION COMPLAINT – NO.                                                                              - 19 -

71.     The specific conduct at issue relates to a fairly recent advent of online sports betting and prediction markets as discussed herein.  Its prohibition, however, and the availability to file suit to regain gambling losses is long-standing, tracing its roots to the adoption of the Statute of Anne.  The relevant portions of that law had two main elements.  The first declared a wide range of gambling transactions void (in effect, freeing the losing party from any obligation to pay the winner).  The second created causes of action to claw back gambling gains.  Those who lost at least "the Sum or Value of ten Pounds" could sue the winner to recover the amount they lost, along "with Co[s]ts of Suit."  And, should the losing party fail to initiate that recovery suit within three months without just cause, any other person could bring a suit against the winning party for treble damages, with half going to the person suing "the other Moiety to the u[s]e of the Poor of the Pari[s]h."  Resembling the modern qui tam action, this last provision deputized the public to serve as private Attorneys General. It also offered a financial incentive to induce them to investigate and pursue claims against gamblers.

72.     Georgia's own version of the Statute of Anne is codified at O.C.G.A. § 13-8-3.  It provides that "[g]ambling contracts are void."  O.C.G.A. § 13-8-3(a).  And, it provides that "[m]oney paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county."  O.C.G.A. § 13-8-3(b).

73.     Defendants in this case provide gambling offerings that clearly violate the State of Georgia's prohibitions.  In filing this action, Plaintiff sues to recover the ill-gotten gains obtained by Defendants from their unlawful gambling offerings.

### RECENT STATE AND FEDERAL LEGISLATION

74.     On March 23, 2026, the Prediction Markets Are Gambling Act (S. 4160), a bipartisan federal bill, was introduced in the U.S. Senate, aimed at banning prediction markets from hosting contracts that mimic sports betting or casino games. Sponsored by Senators Adam Schiff (D-CA), John Curtis (R-UT), and Catherine Cortez Masto (D-NV), the bill seeks to strip

these platforms of their ability to offer sports-themed event contracts by legally categorizing them as gambling rather than financial trading.

75. On May 18, 2026, Minnesota became the first state to expressly outlaw prediction markets after Governor Tim Walz signed a public safety bill (SF 4760) into law.

## CLASS ACTION ALLEGATIONS

76. This action is brought by Plaintiff on behalf of himself and on behalf of all others similarly situated, as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent a nationwide class of all persons who lost money trading at least one sports event contracts on Robinhood (the "Class"), as well as a subclass of all persons in Georgia who lost money trading at least one sports event contracts on Robinhood (the "Georgia Subclass").

77. Unless specifically indicated otherwise, all allegations below concerning the Class include and apply equally to the Georgia Subclass, individually and collectively.

78. Excluded from the Class are Robinhood, Robinhood's executives and officers, and any person, firm, trust, corporation, or other entity related to or affiliated with Robinhood's partners, subsidiaries, affiliates, or joint ventures. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

79. Members of the Class are so numerous and dispersed that it would be impracticable to join them individually. At all relevant times, there were thousands or more of persons who lost money trading one or more sports event contracts on Robinhood. The precise number of Class members and their identities are unknown to Plaintiff at this time but can be determined through discovery.

80. Common questions of law or fact exist as to all members of the Class and predominate over any questions affecting individual members of the Class. Among the questions of law or fact common to Class and/or Georgia Subclass is:

(a) whether, and to what extent, Robinhood's Prediction Markets Hub constitutes an illegal gambling operation;

CLASS ACTION COMPLAINT – NO.　　　　　　　　　　　　　　　　　　　　　　- 21 -

(b)     whether Robinhood violated the laws referenced in the causes of action herein;

(c)     whether Robinhood's conduct was unfair, deceptive, and/or misleading in violation of state consumer protection statutes alleged herein;

(d)     whether Robinhood's wrongful conduct caused loss or damages to Plaintiff, the Class, and the Georgia Subclass and, if so,

(e)     the amount of such loss or damages;

(f)     whether Robinhood's conduct caused Robinhood to be unjustly enriched; and

(g)     whether Plaintiff and the Class are entitled to a reasonable award of attorneys' fees, interest, and costs of suit.

81.     Plaintiff's claims are typical of the claims of members of the Class and Georgia Subclass he seeks to represent because he wagered and lost money on Robinhood's platform, which operates the same as to Class and Georgia Subclass members.

82.     Plaintiff will adequately represent and protect the interests of the Class and Georgia Subclass and has no interests that conflict with or are antagonistic to the interests of Class or Georgia Subclass members.  Plaintiff has retained attorneys who are experienced and capable of prosecuting class actions and complex litigation.

83.     Plaintiff's attorneys will actively conduct and be responsible for prosecuting this litigation, and have adequate resources, experience, and commitment to litigate this matter.

84.     A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and unduly burdensome for each of the individual Class members and Georgia Subclass members to bring a separate action.  Since the damages suffered by individual Class members and Georgia Subclass members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class members and Georgia Subclass members to seek redress for the wrongful conduct alleged.

CLASS ACTION COMPLAINT – NO.                                                                                          - 22 -

85.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  Moreover, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

86.     Defendants have acted on grounds that apply generally to members of the Class and Georgia Subclass such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

87.     Class certification is also appropriate because there is a readily identifiable class on whose behalf this action can be prosecuted.  Class members are readily ascertainable from Robinhood's records.  A notice of pendency or resolution of this class action can be provided to Class members by direct mail, email, publication notice, or other similar means.

88.     To the extent reliance is an element of any of the claims asserted herein, Plaintiff and all Class members uniformly have relied on Robinhood's conduct.

## CAUSES OF ACTION

## COUNT I

**Violation of Civil Remedy Statutes for Recovery of Gambling Losses
On Behalf of Plaintiff and the Class**

89.     Plaintiff repeats and re-alleges here every allegation in paragraphs 1 through 88 above.

90.     Plaintiff brings this claim against Defendants on behalf of himself and the Class under each individual states' civil statutes for recovering gambling losses ("Civil Remedy Statutes for Recovery of Gambling Losses"), which are materially uniform across the nation.

91.     In the alternative, Plaintiff brings this action on behalf of residents of each state listed in paragraph 92, including members of the Georgia Subclass (collectively, the "State Subclasses"), under the Civil Remedy Statutes for Recovery of Gambling Losses enacted under the law of each state.

92.     Over half of the states in the country, including Georgia, have enacted the following Civil Remedy Statutes for Recovery of Gambling Losses, all of which were designed to effectuate the states' public policy against gambling, including:

(a)     **Alabama**: Ala. Code § 8-1-150

(b)     **Alaska**: Alaska Stat. § 09.50.060

(c)     **Arkansas**: Ark. Code Ann. § 16-118-102

(d)     **Colorado**: Colo. Rev. Stat. § 18-10-104

(e)     **Connecticut**: Conn. Gen. Stat. § 52-554

(f)     **District of Columbia**: D.C. Code § 16-1702

(g)     **Florida**: Fla. Stat. Ann. § 849.26

(h)     **Georgia**: O.C.G.A. § 13-8-3

(i)     **Idaho**: Idaho Code § 18-3803

(j)     **Illinois**: 720 ILCS 5/28-8

(k)     **Indiana**: Ind. Code § 34-24-3-1

(l)     **Iowa**: Iowa Code § 537A.4

(m)     **Kentucky**: KRS § 372.020

(n)     **Louisiana**: La. Civ. Code art. 2984

(o)     **Maryland**: Md. Code Ann., Crim. Law § 12-110

(p)     **Michigan**: Mich. Comp. Laws § 600.2939

(q)     **Mississippi**: Miss. Code Ann. § 87-1-1

(r)     **Missouri**: Mo. Rev. Stat. § 434.050

(s)     **New Jersey**: N.J. Rev. Stat. § 2A:40-5

(t)     **New Mexico**: N.M. Stat. Ann. § 44-5-1

(u)     **New York**: N.Y. Gen. Oblig. Law § 5-421

(v)     **Ohio**: Ohio Rev. Code Ann. § 3763.02

(w)     **Pennsylvania**: 12 Pa. Cons. Stat. § 7301

(x)     **Rhode Island**: R.I. Gen. Laws § 11-19-16

(y)     **South Carolina**: S.C. Code Ann. § 32-1-10

(z)    **Tennessee**: Tenn. Code Ann. § 29-19-104

(aa)    **Virginia**: Va. Code Ann. § 11-15

(bb)    **Washington**: Wash. Rev. Code § 4.24.070

(cc)    **West Virginia**: W. Va. Code § 55-9-1

(dd)    **Wisconsin**: Wis. Stat. § 895.05

93.    These statutes reflect a longstanding and deeply-rooted public policy disfavoring speculative gambling enterprises that prey upon consumers, encourage compulsive wagering behavior, destabilize household finances, and deplete retirement funds accumulated over lifetimes. These are gambling bets that are not subject to the regulations, oversight, transparency, and other safeguards concerning disclosure, suitability, investor education, market manipulation, solvency, conflicts of interest, or recovery of losses that ordinary consumers would be entitled to in traditional securities and commodities markets.

94.    Plaintiff and members of the Class and/or the State Subclasses have suffered substantial and multifaceted harm arising from participation in an unlawful prediction market gambling platform operating in contravention of the public policy and statutory prohibitions of numerous states, including, but not limited, to the State of Georgia.  By facilitating and profiting from wagering contracts that constitute unlawful gambling under applicable state law, Defendants' prediction market platform exposed Plaintiff to foreseeable financial injury, emotional distress, and consequential economic harm that extend well beyond the immediate losses sustained on individual wagers.

95.    As a direct and proximate result of Defendants' conduct, Plaintiff and members of the Class and/or State Subclasses suffered substantial monetary losses through speculative contracts and wagering transactions that would not have occurred absent Defendants' unlawful operation and inducement of gambling activity.  Plaintiff and members of the Class and/or State Subclasses further suffered consequential financial harm, including depletion of savings, erosion of investment capital, impairment of liquidity, increased debt obligations, margin exposure, forced liquidation of securities positions, and diminution of the value and stability of Plaintiff's broader investment portfolio.  To the extent Plaintiff and members of the Class and/or State Subclasses

utilized brokerage-linked accounts, margin facilities, or leveraged positions in connection with funding or collateralizing prediction-market activity, the unlawful gambling conduct exacerbated Plaintiff's and members of the Class' and/or State Subclasses's exposure to market volatility and created cascading losses across otherwise unrelated securities holdings.  Plaintiff and members of the Class and/or State Subclasses additionally suffered loss of opportunity costs, including the inability to deploy capital toward lawful investments, retirement savings, educational expenses, housing costs, or other legitimate financial objectives.  Such harms were reasonably foreseeable consequences of an enterprise designed to encourage repeated speculative wagering under the guise of lawful financial participation.

96.     Plaintiff and members of the Class and/or State Subclasses have also suffered non-economic and equitable harms arising from Defendants' unlawful conduct.  Defendants' platform was designed to gamify and normalize high-risk speculative behavior through continuous inducements, representations concerning legality and legitimacy, and interfaces intentionally crafted to stimulate compulsive participation.  As a consequence, Plaintiff and members of the Class and/or State Subclasses were subjected to foreseeable emotional distress, anxiety, disruption of financial security, impairment of familial and personal relationships, reputational concerns, and diminished confidence in the integrity of lawful financial markets.  Defendants' conduct further resulted in unjust enrichment, as Defendants derived revenues, fees, commissions, spreads, trading volume, and other financial benefits directly from unlawful gambling activity prohibited under state law.  Equity requires disgorgement of all ill-gotten gains and restoration of monies wrongfully obtained from Plaintiff and similarly situated participants.

97.     Accordingly, Plaintiff individually and on behalf of the Class and/or on behalf of the State Subclasses, the Georgia Subclass, seeks all remedies available at law and in equity, including, but not limited to: restitution and recovery of all gambling losses pursuant to applicable state civil recovery statutes; rescission of unlawful wagering contracts; compensatory damages; consequential damages; statutory damages; treble or enhanced damages where authorized by statute; prejudgment and post-judgment interest; disgorgement of profits; constructive trust remedies; accounting of all monies received and retained by Defendants; declaratory relief

establishing the illegality and unenforceability of the wagering transactions; injunctive relief prohibiting further unlawful operations within the state; attorneys' fees and litigation costs where permitted; and such additional equitable relief as the Court deems just and proper.

98.    In addition, Plaintiff individually and on behalf of the Class and/or on behalf of the State Subclasses, including the Georgia Subclass, seeks all available tracing and recovery remedies necessary to restore the status quo ante and prevent dissipation of unlawfully obtained funds, including temporary restraining orders, preliminary injunctions, asset freezes, equitable liens, and constructive trusts imposed upon revenues or accounts derived from unlawful gambling operations.  To the extent Defendants represented or implied that the prediction-market activity was lawful, regulated, investment-oriented, or otherwise exempt from state gambling prohibitions, Plaintiff, individually and on behalf of the Class and/or on behalf of the State Subclasses, including the Georgia Subclass, further seeks rescission and fraud-based relief predicated upon material omissions and misrepresentations concerning the legality, risks, and financial dangers associated with the Robinhood platform.

99.    Plaintiff, individually and on behalf of the Class and/or on behalf of the State Subclasses, including the Georgia Subclass, respectfully submits that the broad remedial purposes underlying state anti-gambling statutes, together with longstanding equitable principles disfavoring unlawful wagering enterprises, warrant comprehensive monetary and equitable relief sufficient to fully compensate them, deter future misconduct, and vindicate the states' strong public policy against unlawful gambling activity.

## COUNT II

**Violation of O.C.G.A. § 13-8-3**
**On Behalf of Plaintiff and the Georgia Subclass**

100.    Plaintiff repeats and re-alleges here every allegation in paragraphs 1 through 88 above.

101.    Plaintiff, individually and on behalf of the Georgia Subclass, brings this count against Defendants under O.C.G.A. § 13-8-3.

102.    Under O.C.G.A. § 13-8-3:

CLASS ACTION COMPLAINT – NO.                                                                              - 27 -

(a)     Gambling contracts are void; and all evidences of debt, except negotiable instruments in the hands of holders in due course or encumbrances or liens on property, executed upon a gambling consideration, are void in the hands of any person.

(b)     Money paid or property delivered upon a gambling consideration may be recovered from the winner by the loser by institution of an action for the same within six months after the loss and, after the expiration of that time, by institution of an action by any person, at any time within four years, for the joint use of himself and the educational fund of the county.

103.    Plaintiff, and upon information and belief, thousands of individuals in the State of Georgia have lost and continue to lose money gambling on Defendants' platforms and have yet to sue to recover those losses within six months of payments to Defendants.  The identity and precise number of such victims is within the unique possession of Defendants.

104.    Defendants are gambling "winner[s]" within the meaning of O.C.G.A. § 13-8-3.

105.    Plaintiff is a person authorized to sue for the recovery of his own and the losses at gaming of others within the meaning of O.C.G.A. § 13-8-3. Plaintiff, who seeks to represent a Class of gambling victims, and a Subclass of Georgia gambling victims, has not colluded with any such victims in bringing this action.

106.    Defendants' actions, as stated above, have had and are having a substantial effect on interstate commerce.

## COUNT III

**Violation of the Georgia Fair Business Practices Act**
**O.C.G.A. § 10-1-399, *et seq.***
**On Behalf of Plaintiff and the Georgia Subclass**

107.    Plaintiff repeats and re-alleges here every allegation in paragraphs 1 through 88 above.

108.    Robinhood, Plaintiff, and Georgia Subclass members are "persons" within the meaning of the Georgia Fair Business Practices Act ("GFBPA"). O.C.G.A. § 10-1-399(a).

109.    Robinhood is engaged in, and its acts and omissions affect, trade and commerce under O.C.G.A. § 10-1-392(28).  Further, Robinhood is engaged in "consumer acts or practices," which are defined as "acts or practices intended to encourage consumer transactions" under Ga. Code Ann. § 10-1-392(7).

CLASS ACTION COMPLAINT – NO.                                                                    - 28 -

110.    Robinhood engaged in "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" in violation of O.C.G.A. § 10-1-393(a). Those acts and practices include those expressly declared unlawful by O.C.G.A. § 10-1-393(b), such as:

(a)    representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

(b)    representing that goods or services are of a particular standard, quality, or grade if they are of another; and

(c)    advertising goods or services with intent not to sell them as advertised.

111.    In addition, Robinhood engaged in the unfair and deceptive acts and practices described below that, while not expressly declared unlawful by O.C.G.A. § 10-1-393(b), are prohibited by O.C.G.A. § 10-1-393(a).

112.    In the course of its business, Robinhood engaged in unfair acts and practices prohibited by O.C.G.A. § 10-1-393(a), including:

(a)    enabling customers to place gaming wagers against margin on their securities portfolios;

(b)    exposing customers to the loss of their securities portfolios through unregulated and potentially compulsive gaming activities;

(c)    providing inadequate marketing and user-interface design that do not adequately communicate the practical reality that customers are using their securities portfolios as collateral to engage in highly speculative event-contract trading for which there is no corollary underlying collateral (like an investment in gold) or ownership interest (like stock in a company);

(d)    failing to adequately inform users that  placing gaming wagers against margin on their securities portfolios can rapidly erode equity in the user's financial securities account;

(e)    failing to adequately describe risks such as margin calls, forced liquidation, and losses exceeding deposits, and purposefully embedding any such disclosures within lengthy

legal agreements, help-center articles, or generalized risk statements rather than presenting the same in a prominent, transaction-specific manner at the point of trade execution;

(f)    insufficiently warning consumers that speculative trading against margin may expose core investment holdings and long-term stock portfolios to substantial and accelerated losses and even significant debt;

(g)    failing to comply with common law and statutory duties pertaining to notice requirements concerning margin calls, forced liquidation, and losses exceeding deposits; and

(h)    omitting, suppressing, and concealing the material fact that its activities are prohibited by Georgia law.

113.    The misrepresentations and omissions described in the preceding paragraph were material and made intentionally and knowingly with the intent that Plaintiff and Georgia Subclass members rely upon them in connection with trading and/or investing on the Robinhood platform.

114.    Robinhood knew of the inadequate information, notice, and warnings as well as omissions and of the vulnerability to addiction of individuals engaged in gambling, wagering, and sports betting but concealed these security failings.

115.    Robinhood's deceptive acts and practices were likely to and did, in fact, deceive the public at large and reasonable consumers, including Plaintiff and Georgia Subclass members, regarding the legality of its offerings and the risk of loss to their financial portfolios.

116.    Plaintiff and Georgia Subclass members relied to their detriment upon Robinhood's representations and omissions regarding the legality of Defendants' offerings and risk to their financial holdings.

117.    Robinhood acted intentionally, knowingly, and maliciously to violate the GFBPA, and recklessly disregarded Plaintiff's and Georgia Subclass members' rights.

118.    Robinhood's violations present a continuing risk to Plaintiff and Georgia Subclass members, as well as to the general public.

119.    Robinhood's unlawful acts and practices complained of herein affect the consumer marketplace and the public interest, including the millions of U.S. residents and many Georgia Subclass members.

120. As a direct and proximate result of Robinhood's violations of the GFBPA, Plaintiff and Georgia Subclass members have suffered injury-in-fact, monetary, and non-monetary damages, as described herein.

121. The GFBPA permits any person who suffers injury or damages as a result of the violation of its provisions to bring an action against the person or persons engaged in such violations. O.C.G.A. § 10-1-399(a).

122. Among others, Plaintiff brings this action on behalf of himself and Georgia Subclass members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers and the public at large to make informed decisions related to their financial portfolios and to protect the public from Robinhood's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable, and unlawful practices.

123. Plaintiff and Georgia Subclass members are entitled to a judgment against Robinhood for actual and consequential damages; general, nominal, exemplary, and trebled damages and attorneys' fees pursuant to the GFBPA; costs; and such other further relief as the Court deems just and proper.

## COUNT IV

### Violations of the California Unfair Competition Law, Cal. Civ. Code § 17200, *et seq*. On Behalf of Plaintiff and the Class

124. Plaintiff repeats and re-alleges here every allegation in paragraphs 1 through 88 above.

125. Robinhood and Plaintiff are "persons" within the meaning of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*. Plaintiff assert this cause of action against Defendants for unlawful, unfair, and fraudulent business practices; and unfair, deceptive, untrue and misleading advertising, as defined by California's UCL. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice," each of which is separately actionable.

CLASS ACTION COMPLAINT – NO.                                                                 - 31 -

126.    Defendants' conduct violates the UCL, as the acts and practices of Defendants constitute a common and continuing course of conduct by means of "unlawful," "unfair," and "fraudulent" business acts or practices within the meaning of the UCL.

A.    **Unlawful**

127.    As alleged herein, Robinhood's Prediction Markets Hub, and, generally. the sale of illegal and unregulated sports event contracts to its customers through its mobile app and website, violates at least the following laws:

(a)    The Civil Remedy Statutes for Recovery of Gambling Losses;

(b)    O.C.G.A. § 13-8-3; and

(c)    O.C.G.A. § 10-1-399, *et seq.*

(d)    California's Gambling Control Act (Cal. Bus. & Prof. Code § 19800, *et seq.*): Sections 19801 and 19850 of the Gambling Control Act provide that unless licensed, state law prohibits commercially operated gambling facilities; that no new gambling establishment may be opened except upon affirmative vote of the electors; that all gambling operations and persons having significant involvement therein shall be licensed, registered, and regulated; and that all persons who deal, operate, carry on, conduct, maintain, or expose for play any gambling game shall apply for and obtain a valid state gambling license.  Neither Robinhood nor Kalshi has applied for or obtained any state gambling license, and, therefore, Robinhood violates California's Gambling Control Act.  As the California legislature reaffirmed in 2008, "[n]o person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

(e)    California Penal Code Section 330, which provides in relevant part that "[e]very person who . . . conducts, either as owner or employee ... any banking or percentage game played with . . . any device, for money, checks, credit, or other representative of value . . . is guilty of a misdemeanor."  Cal. Penal Code § 330.  A "banking game" refers to a situation where the "house" is a participant in the game, taking on all contestants, paying all winners, and collecting from all losers. *See Sullivan v. Fox*, 189 Cal. App. 3d 673, 678 (1987).  And, a "percentage game" refers to a situation where the house collects a portion of the bets or wagers made by contestants,

but is not directly involved in game play. *See id*. at 679. Robinhood operates both illegal banking games when it trades through Kalshi and illegal percentage games when it takes fees on bets made by consumers.

(f)    California Penal Code Section 337a, which prohibits additional conduct, including: i) "Pool selling or bookmaking, with or without writing, at any time or place," Cal. Penal Code § 337a(a)(1); and (ii) "[R]eceiv[ing], hold[ing], or forward[ing] . . . in any manner whatsoever, any money . . . staked, pledged, bet or wagered, or to be staked, pledged, bet or wagered, or offered for the purpose of being staked, pledged, bet or wagered, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever," *id*. at (a)(3). "[A]t any time or place, record[ing], or register[ing] any bet or bets, wager or wagers, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of person or animal, or between persons, animals, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever." *Id.* at (a)(4). Robinhood acts as a bookmaker, and accepts pooled bets on the results of sports events.

(g)    California Penal Code § 337j(a)(2): Robinhood violates Cal. Penal Code § 337j(a)(2) by "receiv[ing], directly or indirectly, any compensation or reward or any percentage or share of the revenue, for keeping, running, or carrying on any controlled game." Robinhood directly receives compensation by taking a share of consumers' bets.

## B.    **Unfair**

128.    Robinhood's conduct with respect to the sale of illegal and unregulated sports event contracts to its customers is unfair because Robinhood's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to consumers.

129.    Robinhood's conduct with respect to the sale of illegal and unregulated sports event contracts to its customers is also unfair because it violates public policy as declared by specific

statutory or regulatory provisions, including Cal. Penal Code § 330, Civil Remedy Statutes for Recovery of Gambling Losses, California Civil Code § 22.2, and California common law, which provides that the common law of England is the rule of decision in California courts unless inconsistent with federal or California law.

130.    Robinhood's conduct with respect to the sale of illegal and unregulated sports event contracts to its customers is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers, themselves, can reasonably avoid.

131.    Defendants' conduct is likewise unfair, because its utility, if any, is greatly outweighed by the harm it causes to Plaintiff and the Class; and because it is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers; and because it violates established public policy as alleged herein.  As alleged herein, Robinhood makes unlawful sports gambling widely available through its platform without a requisite license from the C.A. Commission and, in connection, made false representations about the nature of its offering to users.

C.    **Fraudulent**

132.    Robinhood committed – and continues to commit – fraudulent business practices by, among other things, enabling its customers to place gaming wagers against margin on their securities portfolios, exposing them to the loss of their securities portfolios through unregulated and potentially compulsive gaming activities, without disclosing material information explaining that using their Robinhood securities portfolios as collateral to engage in highly speculative event-contract trading can rapidly erode equity in the customer's financial securities account.

133.    Further, Robinhood's educational materials, which Plaintiff and the Class saw and relied on, were misleading in that they fail to adequately describe risks such as margin calls, forced liquidation, and losses exceeding deposits. The misleading nature of these materials is compounded by the fact that they are often embedded within lengthy legal agreements, help-center articles, or generalized risk statements rather than presented in a prominent, transaction-specific manner at the point of trade execution.

134. As such, Robinhood deceptively fails to warn consumers that speculative trading against margin may expose core investment holdings and long-term stock portfolios to substantial and accelerated losses and even significant debt.

135. Robinhood's conduct is likewise "fraudulent" because Robinhood has, through the affirmative misstatements and/or omissions alleged herein, tricked consumers into believing the operation of its gambling website is lawful in Georgia, in California, and throughout the country when it is not, causing Plaintiff and Class members to lose millions of dollars in the aggregate. Robinhood falsely represented its products as "investments" or "trading" when, in reality, they are unlawful gambling.

136. Plaintiff and the Class lost money or property by reason of Defendants' violations of the UCL and suffered injury-in-fact, including their gambling losses.

137. Had Plaintiff and the Class known Defendants failed to disclose material information regarding the risks of using their Robinhood securities portfolios as collateral to engage in highly speculative event-contract trading, they would not have done so.

138. In accordance with California Business & Professions Code § 17203, Plaintiff seeks an order enjoining Robinhood from continuing to conduct business through unlawful, unfair, or fraudulent acts and practices and to commence a corrective advertising campaign. Robinhood's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

139. On behalf of himself and the Class, Plaintiff also seeks an order for the restitution and disgorgement of all monies from Robinhood's illegal gambling offering practices.

140. As a direct and proximate cause of Defendants' violations of the UCL, Plaintiff and the Class suffered an injury in fact and have suffered monetary harm. Defendants, on the other hand, have been unjustly enriched. The Court should require Defendants to make restitution to Plaintiff and the Class and/or disgorge its ill-gotten profits pursuant to California Business & Professions Code § 17203.

141. Defendants' unlawful, unfair, and fraudulent business practices, as described herein, present a continuing threat to Plaintiff and the general public in that Defendants' deceptive

conduct is ongoing.  Plaintiff further seek an order enjoining Defendants from engaging in any unlawful or inequitable acts and practices as alleged herein.

142.    Plaintiff and the Class seek equitable relief because they have no other adequate remedy at law.  Legal remedies available to Plaintiff and Class members are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief.  Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff and Class members failed to sufficiently adduce evidence to support an award of damages. Damages and restitution are not necessarily the same amount.  Unlike damages, restitution is not limited to the amount of money the defendant wrongfully acquired plus the legal rate of interest.  Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because claims under the statutes herein entail few elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law. Due to these differences in proof and certainty, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law for damages.  Even if legal remedies may be available, Plaintiff seeks equitable remedies in the alternative to legal remedies which are as of yet uncertain.

143.    Legal remedies available to Plaintiff and Class members are inadequate because they do not address likely future harms.  As of the date of this filing, Robinhood continues to operate its unlawful gambling business.  If Robinhood is not enjoined from continuing to operate its unlawful gambling business, Robinhood will continue to injure Plaintiff and Class members through the misconduct alleged herein.

## COUNT V

### Unjust Enrichment
### On Behalf of Plaintiff and the Class

144.    Plaintiff repeats and re-alleges here every allegation in paragraphs 1 through 88 above.

CLASS ACTION COMPLAINT – NO.                                                                            - 36 -

145.    Plaintiff and the Class conferred a benefit on Robinhood by trading event contracts on Robinhood's platform and paying commission fees per contract.  Robinhood knowingly offered illegal sports bets and unjustly profited on Plaintiff and the Class.

146.    In the absence of a contract, Plaintiff and the Class have no adequate remedy at law.

147.    Robinhood's unjust enrichment can be remedied by ordering Defendants to provide restitution, and to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class, all proceeds received from Plaintiff and the Class as a result of unlawful and/or inequitable conduct described herein.

148.    Defendants' illegal conduct has directly caused significant monetary damages to Plaintiff.  The precise amount of damages Plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter a final judgment against each Defendant as follows:

A.    Certify this action as a class action, appoint Plaintiff as Class Representative for both a nationwide Class and Georgia Subclass, and designate the undersigned as Class Counsel;

B.    A declaratory judgment finding that Defendants have violated and are liable under O.C.G.A. § 13-8-3, as well as each and every Civil Remedy Statutes for Recovery of Gambling Losses set forth in paragraph 92 above; the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-399, *et seq*.; and the California Unfair Competition Law, Cal. Civ. Code § 17200, *et seq*.;

C.    An award of monetary damages and all applicable exemplary and nominal damages for fraudulent and deceptive consumer practices;

D.    An award of all remedies available under the Civil Remedy Statutes for Recovery of Gambling Losses (including O.C.G.A. § 13-8-3 and the Civil Remedy Statutes for Recovery of Gambling Losses set forth in paragraph 92 above), including, but not limited to, restitution and recovery of all gambling losses pursuant to applicable state civil recovery statutes; rescission of unlawful wagering contracts; compensatory damages; consequential damages; statutory damages;

CLASS ACTION COMPLAINT – NO.                                                                                      - 37 -

treble or enhanced damages where authorized by statute; prejudgment and post-judgment interest; disgorgement of profits; constructive trust remedies; accounting of all monies received and retained by Defendants; declaratory relief establishing the illegality and unenforceability of the wagering transactions; injunctive relief prohibiting further unlawful operations within the state; attorneys' fees and litigation costs where permitted; and such additional equitable relief as the Court deems just and proper, including monetary damages;

E.      An award of all remedies under the GFBPA and the UCL, including, but not limited to, actual and consequential damages; restitution; general, nominal, exemplary, and trebled damages and attorneys' fees and costs;

F.      An award of monetary damages, including treble damages, and punitive damages pursuant to O.C.G.A. § 51-12-5.1;

G.      An award restitution and/or disgorgement;

H.      A preliminary, and thereafter permanent, injunction as follows:

(a)      prohibiting each Defendant from engaging in, enforcing, carrying out, renewing, or attempting to engage in, enforce, carry out, or renew any of the illegal conduct;

(b)      imposing certain affirmative obligations on Defendants regarding aspects of its corporate governance and corporate mandate, including requiring Defendants to inform users that the event contracts at issue violate Georgia law and California law and are unenforceable; enhance notifications concerning risks of prediction markets and event contracts particularly as traded on margin; and provide notifications concerning gambling addiction and assistance; and

(c)      requiring certain corporate compliance reforms for the benefit of Defendants' users;

I.      An award of Plaintiff's attorney's fees, costs and pre-judgement and post-judgement interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

J.      An award of such other relief as may be appropriate and as the Court may deem proper.

CLASS ACTION COMPLAINT – NO.                                                                    - 38 -

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED:  June 10, 2026

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (SBN 213113)


*s/ Shawn A. Williams*
Shawn A. Williams

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
shawnw@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN (SBN 286202)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
bcochran@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON*
ALEXANDER C. COHEN*
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
sdavidson@rgrdlaw.com
acohen@rgrdlaw.com

HERMAN JONES LLP
JOHN C. HERMAN*
3424 Peachtree Road, NE, Suite 1650
Atlanta, GA  30326
Telephone:  404/504-6500
jherman@hermanjones.com

HERMAN JONES LLP
SERINA M. VASH*
153 Central Avenue, Suite 131
Westfield, NJ  07090
Telephone:  862/250-3930
svash@hermanjones.com

Attorneys for Plaintiff and the Class

* *Pro hac vice* forthcoming

CLASS ACTION COMPLAINT – NO.                                                    - 39 -